**Beth FREEMAN, individually and on behalf of all others similarly situated,**

v.

**BLUE RIDGE PAPER PRODUCTS, INC.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Nov. 7, 2006 Session.

Jan. 25, 2007.

Permission to Appeal Denied by Supreme Court June 25, 2007.

---

W. Kyle Carpenter and Robert L. Vance, Knoxville, Tennessee, for appellant.

Gordon Ball and Thomas S. Scott, Jr., Knoxville, Tennessee, for appellee.

## OPINION

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the court, in which D. MICHAEL SWINEY, J., and SHARON G. LEE, J., joined.

In this class action, the jury returned a verdict for plaintiff's class which the Trial Judge approved. Defendant appealed and we affirm the Trial Court's Judgment.

In this action sustained by the Trial Court as a class action, a jury returned a verdict awarding two million dollars in aggregate damages against defendant, which was approved by the Trial Judge. Defendant has appealed.

### Background

Blue Ridge Paper Products, Inc. ("Blue Ridge") owns and operates a pulp and paper mill (the "Mill") in Canton, North Carolina, which is located on the Pigeon River. Under Blue Ridge's management, the Mill discharges compounds into the Pigeon River, including aluminum, arsenic, barium, boron, chloroform, iron, lead, magnesium, manganese, mercury, nickel, nitrate, nitrogen, oil and grease, phenol, surfactants, sulfate, titanium, and zinc. Plaintiff Freeman has lived along the Pigeon River since 1930, and on April 15, 2003, filed the Complaint against Blue Ridge in the Circuit Court for Cocke County. She brought the action on behalf of herself and "all individuals who own or owned real property adjoining and/or abutting the Pigeon River in Cocke County, Tennessee from the period beginning June 1, 1999 until the present." The class consists of approximately 300 individuals.

The Complaint alleged that defendant's pollutants have "substantially diminished the quality of the waters, environment, and resources downstream of and along the Pigeon River in Cocke County ... thereby causing a private nuisance, and damaging all persons who own land abutting or adjacent to the Pigeon River in Cocke County, Tennessee." Defendant filed numerous defenses, but on November 20, 3003, the Circuit Court after a hearing on the Motion for Class Certification, held that plain-

tiff had satisfied the requirements of Rule 23 of the Tennessee Rules of Civil Procedure, and certified the class pursuant to Rule 23.02(3).[1] Following the evidentiary hearing, and during closing argument, plaintiff's counsel told the jury that he wished he could have brought the lawsuit on behalf of the entire county and that it was up to the jury to act as "the conscience of the community." Defense counsel objected to this statement, and although the Circuit Court did not expressly tell the jury that they are not the conscience of the community, the Court's jury instructions included statements instructing the jury to base their decision exclusively upon the evidence.[2]

On August 17, 2005, the jury returned a verdict, awarding two million dollars in aggregate damages, but did not award any punitive damages. On September 2, 2005, the Circuit Court entered a Judgment in accordance with the jury verdict. An appeal followed to this Court.

These issues are raised on appeal:

A. Whether the Circuit Court erred in certifying this lawsuit as a class action?

B. Whether the Circuit Court erred in submitting the question of damages to the jury on a class wide basis?

C. Whether the Circuit Court erred in admitting the expert testimony of James Kite and Dr. John McElligott?

D. Whether the Circuit Court erred in allowing the jury to consider "fear of chemicals?"

E. Whether the plaintiff's counsel made an improper closing argument necessitating a new trial?

F. Whether the Circuit Court erred in entering judgment for the class on the jury's verdict?

### Analysis and Judgment on the Issues

■■ Tenn. R. Civ. P. 23 governs class action certifications. The party seeking class certification must show that all four of the prerequisites listed in Rule 23.01 are satisfied and at least one of the three circumstances listed in Rule 23.02 exists. *Hamilton v. Gibson County Utility Dist.,* 845 S.W.2d 218, 225 (Tenn.Ct.App.1992). The Circuit Court certified this action as a Rule 23.02(3) class action after finding that the Plaintiff satisfied the requirements of the Rules. Blue Ridge argues that the Court erred because the requirements of Rules 23.01(3) and 23.02(3) are not satisfied, and that certification violated its constitutional right to due process.

**1.** The Circuit Court's order stated that Ms. Freeman satisfied the requirements of subparts 23.01, 23.02(1) and 23.02(3), but it did not specify whether the class would be certified under subparts 23.02(1) or 23.02(3). The Circuit Court did, however, approve a class notice form which provided class members with the right to opt out of the class. Thus, the Circuit Court must have intended to certify the class under subpart 23.02(3) because classes under subpart 23.02(1) do not have opt out rights. Tenn. R. Civ. P. 23.03(2); *see Meighan v. U.S. Sprint Communications Co.,* 924 S.W.2d 632, 636 (Tenn.1996).

**2.** Plaintiffs' counsel stated:

[I]f you in your wisdom decided to give each landowner in this case $74,000.00, that's probably a lot of money. I think it comes to about 22 million dollars. And, you know, whether or not the landowners deserve it because they just happen to own the land and live next to it as opposed to the rest of the county, I've always questioned that.... *I'd love to bring this lawsuit on behalf of everybody in the county, but I can't do it.* It's not possible. All I can do is bring it on behalf of the landowners. And that's what we did, and *it's up to you. You're the conscience of the community.* And what you say, you know, at the end of the day, that's what it's going to be.

■■■ "[T]he determination of whether an action should proceed as a class action is a matter which is left to the sound discretion of the trial judge. Only upon a finding of an abuse of that discretion should the trial judge's decision be modified on appeal." *Meighan v. U.S. Sprint Communications Co.*, 924 S.W.2d 632, 637 (Tenn.1996). Thus, such a decision will only be modified if it was inconsistent with the substantial weight of the evidence or resulted from the trial court's misinterpretation or misapplication of controlling legal principles. *White v. Vanderbilt University*, 21 S.W.3d 215, 223 (Tenn.Ct.App.1999). If reasonable judicial minds could differ as to the decision's soundness, the decision must stand. *Id.*

■■■ Regarding the prerequisites in Rule 23.01, Blue Ridge argues that plaintiff failed to satisfy the "typicality" requirement of Rule 23.01(3). It raises no issue as to the other three prerequisites. Rule 23.01(3) states, "One or more members of a class may sue or be sued as representative parties on behalf of all only if ... (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class...." Tenn. R. Civ. P. 23.01(3) (2005). "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082

(6th Cir.1996); *see also Senter v. General Motors Corp.*, 532 F.2d 511, 525 n. 31 (6th Cir.1976) ("To be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law.").[3] Plaintiff's claim and the claims of the other class members all arise from the same course of conduct, i.e., Blue Ridge discharging pollutants into the Pigeon River. Additionally, Freeman's claim and the claims of the other class members are all based on the same legal theory, i.e., common law nuisance as governed by North Carolina substantive law.[4]

Nevertheless, Blue Ridge argues that plaintiff has not satisfied the typicality element, and reasons that the plaintiff and the other landowners do not use their property for the same purposes; and the evidence introduced by the plaintiff that Blue Ridge's conduct interferes with the use and enjoyment of her property does not necessarily prove that Blue Ridge's conduct interferes with any other landowner's use and enjoyment of his or her property. Numerous Federal cases, however, have rejected similar arguments and found typicality under analogous circumstances. *Mejdrech v. Met–Coil Sys. Corp.*, 319 F.3d 910 (7th Cir.2003); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D.Colo. 1993); *Yslava v. Hughes Aircraft Co.*, 845 F.Supp. 705 (D.Ariz.1993); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58 (S.D.Ohio 1991); and *Bates v. Tenco*

3. Because Tenn. R. Civ. P. 23 and Rule 23 of the Federal Rules of Civil Procedure use identical language, federal authority is persuasive. *Meighan v. U.S. Sprint Communications Co.*, 924 S.W.2d 632, 637 n. 2 (Tenn.1996).

4. In *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), the United States Supreme Court held that application of the downstream state's law was preempted by Congress when it enacted the Clean Water Act. *Id.* at 491–94, 107 S.Ct.

805. Congress did not, however, preempt the laws of the state where the pollutants originate (the point source state). *Id.* at 497–99, 107 S.Ct. 805. Despite preemption of its law, a downstream state may still exercise judicial jurisdiction over the claim as long as it applies the point source state's law. *Id.* at 500–01, 107 S.Ct. 805. Thus, Tennessee is a proper forum for this case, but North Carolina substantive law must be applied.

*Servs., Inc.,* 132 F.R.D. 160 (D.S.C.1990). But Blue Ridge relies heavily upon *Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir.1998), a case distinguishable on its facts. In *Sprague,* a purported class of 50,000 early retirees alleged that the defendant violated the Employee Retirement Income Security Act of 1974 by denying lifetime health care benefits. *Id.* at 392–93. The early retirees proceeded on a bilateral contract theory and an estoppel theory. *Id.* at 396. The Sixth Circuit Court of Appeals concluded that "the named plaintiffs could not advance the interests of the entire early retiree class" because "[e]ach claim ... depended on each individual's particular interactions with GM-and these ... varied from person to person"; therefore, typicality did not exist.

■ Typicality did not exist in *Sprague* because the named plaintiffs' claims and the class members' claims arose from different courses of conduct—approximately 50,000 separate interactions between GM and individual early retirees. In addition, the named plaintiffs and class members did not share the same legal rights, as their rights were defined by a myriad of different contractual terms and representations. By contrast, Freeman's claim and the class members' claims arose from the same course of conduct, i.e., Blue Ridge discharging pollutants into the Pigeon River. Plaintiff and the class members also share the same legal rights, i.e., "the right of [the waters'] flow past [their] lands for ordinary domestic, manufacturing, and other lawful purposes, without injurious or prejudicial interference by an upper proprietor." *Biddix v. Henredon Furniture Indus.,* 76 N.C.App. 30, 331 S.E.2d 717, 721 (1985) (quoting *Smith v. Morganton,* 187 N.C. 801, 123 S.E. 88, 89 (1924)). We hold that Freeman could advance the interests of the class members and satisfy the typicality element.

The Circuit Court treated this case as a Rule 23.02(3) class action, and Blue Ridge argues that this treatment was inappropriate because Freeman failed to satisfy the requirements of the Rule. The Rule provides:

> An action may be maintainable as a class action if the prerequisites of 23.01 are satisfied, and in addition:
>
> . . . . .
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.

Tenn. R. Civ. P. 23.02(3) (2005).

■ The Rule sets out two prerequisites for the maintenance of a class action: (1) "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Tenn. R. Civ. P. 23.02(3). Specifically, Blue Ridge argues that common issues of law or fact do not predominate. "The determination of [predominance] necessarily depends on whether the class members

will require individualized hearings to prove the elements for each cause of action." *Crouch v. Bridge Terminal Transp., Inc.*, No. M2001–00789–COA–R3–CV, 2002 WL 772998, at *4 (Tenn.Ct.App. Apr.30, 2002).

In North Carolina, "[a] proprietor of real property adjoining a stream has the right to the 'reasonable use' of the water passing through the property. The doctrine of 'reasonable use' permits diminution in the quantity and quality of a watercourse that is consistent with the beneficial use of the land." *Biddix v. Henredon Furniture Indus.*, 76 N.C.App. 30, 331 S.E.2d 717, 721 (1985). If an upper riparian landowner unreasonably alters the water's quantity *or quality*, lower riparian landowners may bring an action in nuisance. *Id.* To recover in nuisance, plaintiffs must show an (1) unreasonable and (2) substantial interference with the use and enjoyment of their property. *Watts v. Pama Mfg. Co.*, 256 N.C. 611, 124 S.E.2d 809, 813–14 (1962); *Whiteside Estates, Inc. v. Highlands Cove, L.L.C.*, 146 N.C.App. 449, 553 S.E.2d 431, 436–38 (2001).

Whether a defendant's interference was unreasonable is a question not only of fact, but also of values to be decided by the jury in light of all the circumstances of the case. *Pendergrast v. Aiken*, 293 N.C. 201, 236 S.E.2d 787, 797 (1977); *Watts*, 124 S.E.2d at 814.

The question is not whether a reasonable person in plaintiffs' or defendant's position would regard the invasion as unreasonable, but whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable. Regard must be had not only for the interests of the person harmed but also for the interests of the defendant, and for the interests of the community.

*Watts*, 124 S.E.2d at 814.

A jury determines this question by "weighing the gravity of the harm to the plaintiff against the utility of the conduct of the defendant." *Pendergrast*, 236 S.E.2d at 797.

Determination of the gravity of the harm involves consideration of the [1] extent and character of the harm to the plaintiff, [2] the social value which the law attaches to the type of use which is invaded, [3] the suitability of the locality for that use, [4] the burden on plaintiff to minimize the harm, and [5] other relevant considerations arising upon the evidence. Determination of the utility of the conduct of the defendant involves consideration of [1] the purpose of the defendant's conduct, [2] the social value which the law attaches to that purpose, [3] the suitability of the locality for the use defendant makes of the property, and [4] other relevant considerations arising upon the evidence.

*Id.; see also Watts*, 124 S.E.2d at 814 (listing similar factors).

Blue Ridge argues the class members do not all use their property in the same way; therefore, "these factors will necessarily be different for each member, and Blue Ridge's conduct may be unreasonable as to some class members, but reasonable as to others." The factors, however, suggest a narrower definition of "use." They call for consideration of "the type of use *which is invaded*." The type of use which Blue Ridge had allegedly invaded is the same for all class members, i.e., the right to reasonably use an adjoining watercourse "for ordinary domestic, manufacturing, and other lawful purposes, without injurious or prejudicial interference by an upper proprietor." *Biddix*, 331 S.E.2d at 721. The class members' right

to such use is a property right "inseparably annexed to the soil and pass[ing] with it as a part and parcel of it." *Smith v. Town of Morganton*, 187 N.C. 801, 123 S.E. 88, 89 (1924). Riparian rights are "not dependent upon the owner's actual use or appropriation of the flowing water." *Id.* Accordingly, individualized hearings were not necessary to determine whether Blue Ridge's interference with the class members' riparian rights was unreasonable.

■ The plaintiff, however, must show that the interference was also substantial. A substantial interference involves "more than slight inconvenience or petty annoyance." *Watts*, 124 S.E.2d at 815. It "must work some substantial annoyance, some material physical discomfort, . . . or injury to [the plaintiff's] health or property." *Duffy v. E.H. & J.A. Meadows Co.*, 131 N.C. 31, 42 S.E. 460, 461 (1902). "If normal persons living in the locality would regard the particular situation as definitely offensive or annoying, then the invasion is substantial." Restatement (First) of Torts § 822 cmt. g (1939).[5] "[I]f it is found that the defendant has knowingly polluted soil, surface, or underground water and this pollution has affected to any measurable extent the rental or market value of the plaintiff's land, there normally would be both substantial and unreasonable interference." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 88, at 627 (5th ed.1984).[6]

Blue Ridge insists that the trier of fact "must look to the manner in which each

parcel of property is being used in order to determine whether a substantial interference with that use has occurred." This argument fails for the same reason already stated. All class members have suffered an interference with the same type of use—the right to reasonably use an adjoining watercourse "for ordinary domestic, manufacturing, and other lawful purposes, without injurious or prejudicial interference by an upper proprietor." *Biddix*, 331 S.E.2d at 721. Accordingly, individualized hearings are not necessary to determine whether Blue Ridge's interference with the class members' riparian rights was substantial.

■ Because the circumstances of this case do not require individualized hearings to prove the elements of nuisance, common issues of law and fact predominate over individual issues. The unique factual setting of this case also makes a class action the superior method of adjudicating this controversy. "[W]here the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir.1987). We hold that Freeman satisfied the requirements of Rule 23.02(3).

Next, Blue Ridge argues that the essential elements of nuisance cannot be established on a class wide basis; therefore, class certification altered the substantive

---

**5.** The North Carolina Supreme Court routinely relies upon the Restatement of Torts for guidance regarding the elements of nuisance. *Pendergrast*, 236 S.E.2d at 797 (citing Restatement (First) of Torts §§ 829–31 (1939)); *Watts*, 124 S.E.2d at 815 (citing Restatement (First) of Torts § 822 (1939)).

**6.** The North Carolina Courts also commonly rely upon *Prosser and Keeton on the Law of Torts* regarding the elements of nuisance. *Pendergrast*, 236 S.E.2d at 797 (citing W. Prosser, *Law of Torts* § 87 (4th ed.1971)); *Whiteside Estates, Inc. v. Highlands Cove, L.L.C.*, 146 N.C.App. 449, 553 S.E.2d 431, 437 (2001) (citing *Prosser and Keeton on the Law of Torts* § 88 (5th ed.1984)).

elements of nuisance and violated Blue Ridge's right to due process. As already discussed, the unique factual setting of this case allows the essential elements of nuisance to be established on a class wide basis. This is not an alteration of substantive nuisance law; therefore, certification did not violate Blue Ride's due process rights. Because this case satisfies the requirements of Rule 23 and the Plaintiff's cause of action can be proved on a class wide basis, the Circuit Court did not abuse its discretion when it certified this case as a Rule 23.02(3) class action.

■■■ Blue Ridge argues that the Circuit Court erred in allowing the jury to determine the question of damages on a class-wide basis. The Tennessee Supreme Court has addressed the issue of damages in a class action as follows:

> In a class action, courts are not required to conduct separate damage inquiries for each class member. Instead, the court may determine an aggregate damage amount for the class as a whole. The trial court may simply choose to divide the award among members or may allow each plaintiff to recover by proving his or her claim against the entire judgment.

*Meighan v. U.S. Sprint Communications Co.*, 924 S.W.2d 632, 638 (Tenn.1996) (citation omitted). We hold the Circuit Court properly allowed the jury to determine damages on a class-wide basis.

Next, Blue Ridge argues that the Circuit Court erred in admitting the expert testimony of James Kite and Dr. John McElligott. Kite was offered as a real estate expert to testify as to the impact the pollution in the Pigeon River had on rental values. Kite testified that the class members lost approximately 11 million dollars of rental value, and plaintiff offered Dr.

McElligott as an expert to testify as to the dangers posed by the chemicals identified in the Canton Mill's discharge. Dr. McElligott testified that an individual living along the Pigeon River "should have reasonable concern and take safeguards." Blue Ridge argues that the Circuit Court should not have admitted this testimony.

■■■ To be admissible, expert testimony must be relevant [7] and it must satisfy Tennessee Rules of Evidence 702 and 703. Rule 702 states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 states,

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Therefore, the trial court must determine that (1) the witness qualifies as an expert, and (2) the expert's testimony is reliable in that the facts underlying the testimony are trustworthy and the testimony will substantially assist the trier of fact. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 274 (Tenn.2005) "The objective of the trial court's gatekeeping function is to ensure that 'an expert, whether basing testimony upon professional studies or personal expe-

---

7. Tenn. R. Evid. 401, 402.

rience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 275 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

The trial court's gate-keeping function is reviewed as an abuse of discretion standard.

*Id.* at 273.

■■■ Thus, a trial court's decision to admit or exclude an expert's testimony will not be overturned unless the trial court abused its discretion. *Id.* at 275 (citing *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263–64 (Tenn.1997)). "A trial court abuses its discretion if it applies an incorrect legal standard or reaches an illogical or unreasonable decision that causes an injustice to the complaining party." *Id.* (citing *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn.2002)).

■■■ Blue Ridge argues that "Mr. Kite's testimony was based upon speculation and unfounded assumptions" and that "Dr. McElligott's testimony was not supported by reliable methodology." This argument does not challenge the relevance of the experts' testimony or their qualifications, but only the reliability of their testimony.

[W]hen the expert's reliability is challenged, the court may consider the following nondefinitive factors: (1) the *McDaniel* factors, when they are reasonable measures of the reliability of expert testimony; (2) the expert's qualifications for testifying on the subject at issue; and (3) the straightforward connection between the expert's knowledge and the basis for the opinion such that no "analytical gap" exists between the data and the opinion offered.

*State v. Stevens*, 78 S.W.3d 817, 834–35 (Tenn.2002). "The reasonableness of the *McDaniel* factors[8] in assessing reliability depends upon the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony." *Brown*, 181 S.W.3d at 277. When considering the expert's qualifications, the trial court should determine whether the expert is a "highly credentialed expert who has devoted her life's work to the actual exercise of the methodology upon which her testimony is based" or merely a "marginally-qualified full-time expert witness who is testifying about a methodology that she has not employed in real life." *Id.* at 274. When considering the connection between the expert's knowledge and the opinion's basis, "the court may make a finding of reliability if the expert's conclusions are sufficiently straightforward and supported by a 'rational explanation which reasonable [persons] could accept as more correct than not correct.'" *Stevens*, 78 S.W.3d at

8. In *McDaniel*, the Tennessee Supreme Court listed five factors that trial courts could consider when determining the reliability of scientific testimony:

(1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye*, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn.1997). Although *McDaniel* dealt with scientific expert testimony, the Tennessee Supreme Court later held that "the *McDaniel* factors *may* apply, subject to the discretion of the trial court, 'as reasonable measures of the reliability' of all expert testimony described in Rule 702." *Stevens*, 78 S.W.3d at 834 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

834 (quoting *Wood v. Stihl,* 705 F.2d 1101, 1107–08 (9th Cir.1983)).

■ With regard to Kite's testimony, the *McDaniel* factors are not particularly reasonable measures of his testimony's reliability. Kite based his testimony primarily upon his practical experiences as a real estate broker and appraiser. The practical, experiential nature of Kite's testimony minimizes the importance of the *McDaniel* factors,[9] while also increasing the importance of the other *Stevens* factors (i.e., Kite's qualifications and the connection between his data and opinion).[10]

■ Kite is a licensed real estate broker and appraiser with approximately 35 years of experience conducting real estate appraisals throughout East Tennessee. The record establishes that Kite is a "highly credentialed expert who has devoted

[his] life's work to the actual exercise of the methodology upon which [his] testimony is based." *Brown,* 181 S.W.3d at 274.

■ Kite opined that the Pigeon River's pollution was the only reason that an overnight rental industry had not developed along the river. He concluded that the plaintiff and the class members lost approximately eleven million dollars in rental income due to the pollution in the Pigeon River. His testimony included a detailed step-by-step explanation of his methodology.[11] His detailed explanation demonstrates that his data and his opinion are not separated by an "analytical gap," and establish a road map which allows the jury to understand and weigh his conclusions.[12] While there are weaknesses in Kite's presuppositions,[13] such weaknesses

9. "The rigid application of the *McDaniel* factors to all expert testimony is problematic because all expert testimony may not 'fit' within the factors." *Brown,* 181 S.W.3d at 277. When experts "base[ ] their testimony primarily upon their practical experiences in their respective professions," their testimony no longer "fits neatly within the *McDaniel* factors." *Id.* "An expert may reach a conclusion from observations based upon his or her extensive and specialized experience. Opinions derived in this manner, however, 'do not easily lend themselves to scholarly review or to traditional scientific evaluation.'" *Id.* (quoting *First Tenn. Bank Nat'l Ass'n v. Barreto,* 268 F.3d 319, 335 (6th Cir. 2001)).

10. The expert's qualifications "is applicable particularly where the expert's personal experience is essential to the methodology or analysis underlying his or her opinion," but the expert's qualifications should not be the sole basis of reliability. *Brown,* 181 S.W.3d at 274. "Th[e] 'connection' between the expert's conclusion and the underlying data supporting that conclusion is of especial importance when determining the reliability of experience-based testimony, because observations and experiences are not easily verifiable by the court." *Stevens,* 78 S.W.3d at 834.

11. The steps of Mr. Kite's calculation were as follows: (1) he gathered all of the property tax cards for each parcel bordering the Pigeon River in Cocke County; (2) he visited each parcel and determined how many acres of each parcel could be developed and how many rental units each parcel could support; (3) after concluding that the parcels could support 1,107 rental units, he concluded that the Cocke County rental market could absorb only 599 units; (4) based upon the rental market in similar river-side locations in Townsend and Cosby, he estimated that each unit could be occupied for half the year at a daily rental rate of $72.50; (5) he used this information to calculate the units' potential gross income; (6) after estimating each rental unit's expenses, he determined the units' potential net income.

12. "The straightforward character of the testimony is essential to its reliability because it permits the jury to understand, and thus weigh, the [expert's] conclusion...." *Stevens,* 78 S.W.3d at 834 n. 12.

13. Mr. Kite's opinion of lost rental revenue is based upon the assumption that, in the absence of Blue Ridge's conduct, the class members would have built rental units and rented them all at 50% occupancy for $72.50 per day.

were "tested with the crucible of vigorous cross-examination and countervailing proof." *McDaniel,* 955 S.W.2d at 265. The weight given to an expert's conclusion is for the jury, not the court. *See Brown,* 181 S.W.3d at 275. Kite's testimony employed the same level of intellectual rigor that characterizes the practice of an expert in the field of real estate appraisal, and we conclude the Circuit Court did not abuse its discretion in admitting Kite's testimony.

Dr. McElligott is an occupational health physician specializing in internal medicine and clinical toxicology, licensed to practice medicine in Tennessee. He has testified in various cases involving exposure to chemicals and the health effects of chemicals. His studies include current literature on the genotoxic[14] effects of various chemicals in connection with his work and education. He admitted that he is not a geneticist, an expert on the effects of chemicals on chromosomes, or a certified industrial hygienist. The record shows that he is "highly credentialed" with regard to the acute and chronic health effects of various chemicals, but only "marginally-qualified" with regard to the genotoxic effects of chemicals. This does not render Dr. McElligott's testimony regarding genotoxic effects inadmissible, but his marginal qualifications are a factor to consider when determining his testimony's reliability.

Dr. McElligott's testimony consisted of two segments: (1) his conclusions regarding the potential acute, chronic, and genotoxic health effects of the chemicals Blue Ridge has released into the Pigeon River[15] and (2) his opinion that individuals should have "reasonable concern" regarding the water in the Pigeon River. The reliability of Dr. McElligott's scientific testimony is best determined through application of the *McDaniel* factors. Regarding the potential health effects of the chemicals, Dr. McElligott obtained his conclusions from various government agencies, health organizations, and web-based research databases commonly used by industrial hygienists.[16] The fact that numerous reputable institutions agree that these chemicals have potentially adverse health effects indicates that the existence of these effects are generally accepted. These institutions have made their reports and data available to professionals in Dr. McElligott's field, and these conclusions are subject to peer review. While this litigation was the catalyst of Dr. McElligott's recent survey of this literature, the literature itself is unrelated to the litigation and his professional experience with this literature pre-dates the litigation. The *McDaniel* factors indicate that Dr. McElligott's testimony regarding the chemicals' potentially adverse health effects is reliable.

The second component of Dr. McElligott's testimony was his opinion that individuals living down-stream of the Canton Mill who know that these chemicals have been released into the river, but do not know in what amounts or concentrations, should "have reasonable

---

14. Genotoxic refers to the effect that chemicals may have on cellular genetic material.

15. Blue Ridge admitted to discharging the following compounds into the Pigeon River: aluminum, arsenic, barium, boron, chloroform, iron, lead, magnesium, manganese, mercury, nickel, nitrate, nitrogen, oil and grease, phenol, surfactants, sulfate, titanium, and zinc.

16. These sources included, the American Conference of Governmental Industrial Hygienists, the Agency for Toxic Substances and Disease Registry, the Centers for Disease Control, the Environmental Protection Agency, the EPA Integrated Risk Information System, the National Institute for Occupational Safety and Health, the World Health Organization.

concern and take safeguards." Blue Ridge argues that the Circuit Court's admission of this opinion was error because Dr. McElligott had no information about the concentrations of chemicals present in the river. Although Dr. McElligott made clear that he did not gather any data regarding either the quantities or concentrations of any chemical Blue Ridge discharged into the river, Blue Ridge's discovery admissions indicated that gathering such information may be difficult. Blue Ridge admitted that it "knows of no way to ascertain the amount of each chemical created [in its production process]" and that it does not know the amount of each chemical discharged into the Pigeon River on a daily basis. Accordingly, Blue Ridge cannot fault the witness for failing to gather this information. The thrust of the witness's testimony was that class members should have "reasonable concern," in part, because so little is known about the amounts of chemicals released into the river.

In addition, Blue Ridge presented their own experts. Jonathan Burr, an Aquatic Biologist for the State of Tennessee, who testified that the state monitors the levels of various metals [17] in the Pigeon River and that these metals do not exceed safe levels. Dr. Waddell, a toxicologist, testified that the substances discharged into the Pigeon River were at concentrations lower than the EPA guidelines. In light of these conflicting scientific views between Dr. McElligott and Blue Ridge's experts, the real issue is not the admissibility of Dr. McElligott's testimony, but the weight that should be given to his testimony. "The weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact." *Brown*, 181 S.W.3d at 275. We conclude the Circuit Court's admission of Dr. McElligott's testimony was not an abuse of discretion.

At trial, Blue Ridge requested the Circuit Court to instruct the jury that Ms. Freeman and the class could not recover for fear of chemicals unless the Plaintiff proved that Blue Ridge had in fact created a dangerous condition. The Circuit Court disagreed and provided the following instruction to the jury:

> In order for the plaintiffs to recover for reasonable fear, annoyance, discomfort, stress or anxiety, you must be shown that those feelings are reasonable. In determining whether those feelings are reasonable, you must apply an objective standard and determine whether a reasonable person viewing all of the circumstances of this case would reasonably have those same reactions as a consequence of a defendant's actions. Irrational, unduly sensitive or unreasonable beliefs or fears cannot be a basis for recovery.

Essentially, Blue Ridge argues that reasonable fear does not constitute a substantial interference with the Plaintiff's use and enjoyment of her property, unless Blue Ridge actually created a dangerous condition, and cites *Carroll v. Litton Sys., Inc.*, No. B–C–88–253, 1990 WL 312969, at *56 (W.D.N.C. Oct.29, 1990) for this proposition. However, Blue Ridge relies upon a portion of the *Carroll* opinion addressing a claim for emotional distress, not nuisance. *Id.* at *53–56. (The magistrate recommended dismissal of the nuisance claim on other grounds, i.e., failure to prove any injury.) *Id.* at *57–60, 95.

17. These metals include, aluminum, arsenic, cadmium, iron, lead, manganese, mercury, nickel, and zinc.

Quoting § 88 of *Prosser and Keeton on the Law of Torts,* the North Carolina Court of Appeals has stated, "To be actionable, '[t]he interference must be substantial and unreasonable. *Substantial* simply means a significant harm to the plaintiff and *unreasonably* means that it would not be reasonable to permit the defendant to cause such an amount of harm intentionally without compensating for it.'" *Whiteside Estates, Inc. v. Highlands Cove, L.L.C.,* 146 N.C.App. 449, 553 S.E.2d 431, 437 (2001). This section of *Prosser* also states that when determining whether an interference is substantial, "[f]ears and feelings common to most of the community are to be considered [and may make an interference a nuisance,] although there is no foundation in scientific fact." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 88, at 629 (5th ed.1984); *see also* Restatement (Second) of Torts § 821F cmt. f (1979) ("In determining whether [significant harm] would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account, even though they may be without scientific foundation or other support in fact."). We conclude the Circuit Court's instruction was a correct statement of the law.

During closing argument, Ms. Freeman's counsel told the jury that he wished he could have brought the lawsuit on behalf of the entire county and that it was up to the jury to act as "the conscience of the community." Blue Ridge objected to this statement on the ground that Ms. Freeman's counsel asked the jury to decide the case based upon something other than the evidence and requested a corrective instruction.

The trial court determines what is permitted in the argument of counsel. *Davis v. Hall,* 920 S.W.2d 213, 217 (Tenn.Ct.App.1995). We will not reverse a trial court's discretionary refusal to grant a new trial for inappropriate argument of counsel unless "the argument is clearly unwarranted and made purely for the purpose of appealing to passion, prejudices and sentiment which cannot be removed by sustaining the objection of opposing counsel." *Id.* "An appeal to the jury to act as the community's conscience is not necessarily improper argument." *State v. Patterson,* 966 S.W.2d 435, 446 (Tenn. Crim.App.1997). The Circuit Court instructed the jury to base their decision exclusively upon the evidence, and we conclude the Trial Court did not abuse its discretion on this issue.

Finally, Blue Ridge argues that the record is without any material evidence supporting the jury's verdict.

Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict. T.R.A.P. Rule 13(d).

It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co., Inc. v. C & R Const., Inc.,* 575 S.W.2d 4, 5 (Tenn.1978); *cited with approval in Barnes v. Goodyear Tire and Rubber Co.,* 48 S.W.3d 698, 704–05 (Tenn.2000).

The record contains material evidence to support the verdict. Blue Ridge admitted to discharging the following compounds into the Pigeon River: aluminum, arsenic, barium, boron, chloroform, iron, lead, magnesium, manganese, mercury, nickel, nitrate, nitrogen, oil and grease, phenol, surfactants, sulfate, titanium, and zinc. Dr. McElligott, a clinical toxicologist, testified that many of these chemicals can cause adverse health effects and opined that individuals should have "reasonable concern" regarding the water in the Pigeon River.

Ms. Freeman, a resident of the Pigeon River since 1930, testified that the river smells like rotten eggs and has a light brown color. Ms. Freeman also testified that the foam on the river resembles "slightly colored" wafers about the size of a quarter. She does not swim in the river because of the color, odor, and foam, and she would not eat fish from the river. If the water were clearer, she would attempt rental cabins, and opined that her land would be more valuable if the river was cleaner.

Dr. Jack Clark, a class member, has lived along the Pigeon River his entire life, and described the river as "very discolored" with a "foul odor" and foam. The smell is "medicinal" like "rotten eggs." The foam is "whitish brown" in color. He does not allow his grandchildren to fish or swim in the river. He also does not use the water to irrigate his garden. He opined that his property values would double if the river was clean.

Gay Webb, a long time resident of the County, lives within a quarter mile of the river. Mr. Webb testified that the river is very dark and polluted, and essentially corroborated the other residents' testimony. He also testified that the river above the Canton Mill is in better condition than the river below the Mill.

Plaintiff's real estate expert opined that the Pigeon River's pollution was the only reason that an overnight rental industry had not developed along the river. Based on the foregoing material evidence, we affirm the Trial Court's Judgment based on the jury verdict. The Judgment of the Trial Court is affirmed, and the cause remanded with the cost of the appeal assessed to the defendant, Blue Ridge Paper Products, Inc.