IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 8, 2008 Session

## KEVIN ORNDORFF ET AL. v. EDWARD RON CALAHAN ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 05-1862-I     Claudia C. Bonnyman, Chancellor**

**No. M2007-02060-COA-R3-CV - Filed October 9, 2008**

The buyers of a home in Nashville sued the sellers for misrepresentation, fraud, and breach of
contract. The proof showed the sellers did not acquire the proper permits and inspections required
by the applicable building codes and that work on the plumbing, the electrical system, and the
heating and air conditioning system was not performed in accordance with the codes. The sellers
did not disclose the lack of permits and improper work on the statutorily required disclosure form.
The chancellor found for the buyers. The sellers appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., joined.
PATRICIA J. COTTRELL, P.J., M.S., not participating.

Fred C. Dance, Franklin, Tennessee, for the appellants, Edward Ron Calahan and wife, Diane R.
Calahan.

Phillip P. Welty, Nashville, Tennessee, for the appellees, Kevin Orndorff and wife, Marguerite
Orndorff.

### OPINION

According to the Joint Statement of the Evidence,[1] the defendants, Ron and Diane Calahan,
purchased the property, including a house, at 204 Wilsonia Avenue in Nashville, Tennessee, in 1998.
The house was originally built in the 1950s. About a year after their purchase, the Calahans
embarked upon an extensive remodeling of the house that included the addition of a new kitchen,
great room, bathroom, and garage. They also added a new upstairs with two bedrooms and full
bathrooms. In 2004, Mr. Calahan took a new position with his employer, and the family moved out

---

[1]The Joint Statement of the Evidence concerns the first day of trial only. No transcript is available for that day.

of state. The property was put up for sale. The MLS listing indicated that the property had a "top to bottom renovation: new roof, gutters, plumbing electrical, 3 HVAC's, kitchen, baths!"

Mr. Orndorff visited the property in early July, 2004. Mrs. Orndorff visited it on July 24, 2004, with their real estate agent and the Calahans' real estate agent, Vernice Bryan. During the visit or shortly before, Mrs. Orndorff received the MLS listing. Ms. Bryan also told Mrs. Orndorff about the additions, bathrooms, kitchen, laundry room, HVAC units, and appliances during the visit. At no time during this visit was Mrs. Orndorff told by Ms. Bryan or anyone else about any problems with the property, code compliance or approval, or defects in the property's systems or their functions. She did not observe or experience any problems during the visit.

Mrs. Orndorff found the Calahan's property appealing because it was newly remodeled and updated. On Sunday, July 25, 2004, the Orndorffs decided to make an offer to purchase the property. They filled out a contract offering a purchase price of $965,000, signed it, and faxed it to their real estate agent in Nashville. The next day, they received a faxed Tennessee Residential Property Disclosure Form dated July 26, 2004, and signed by the Calahans. Later that day, the Orndorffs received a counter-offer from the Calahans which, among other things, changed the purchase price to $985,000. Mrs. Orndorff reviewed the counter-offer and disclosure form with Mr. Orndorff by telephone that day and then faxed the contract back to their real estate agent with another counter-offer of $970,000. The Calahans accepted that price. The copy of the contract obtained from the Orndorffs' real estate agent states, "Effective Date of Contract July 27, 2004."

The Orndorffs were never informed of any problems with the property or of any code compliance issues. The Disclosure Form states at items 6, 7, and 26 that there are no issues or problems of compliance with building codes or permits or any other government regulation. No other problems respecting the property or the function of its systems are set forth in the Disclosure Form.

An inspection period was provided for in the contract. A home inspection was done which noted a number of minor issues, but it did not cover structural issues or building code compliance. The Orndorffs did not have a more extensive inspection because they never had any indication or reason to believe that there was any problem with the structure or with its building code compliance. Mrs. Orndorff testified that had they been aware of any such problems, they would have terminated the contract and not purchased the property.

The closing occurred on September 10, 2004, and the Orndorffs moved in a couple of days later. About September 26, 2004, they started experiencing problems. There were periodic smells of raw sewage in the upstairs bathroom. The toilets in three bathrooms periodically and unpredictably bubbled, gurgled, and/or overflowed. The laundry room sink backed up and filled with water as the washing machine emptied. The kitchen sink backed up. The air-conditioning and heating units ran simultaneously. These problems caused significant expense, hassle and hardship.

The remainder of the evidence is found in the trial transcript and in the exhibits. Everett Turner, Jr. worked for his father[2] on the renovations to the Calahan home. They did the demolition, framing, siding, and the roof. Everett Turner testified that they were subcontractors, not general contractors. They had no control over any of the subcontractors. He thought Mr. Calahan obtained the permits and was overseeing all the subcontractor work.

Portions of Mrs. Calahan's deposition were read into evidence. She considered Mr. Turner to be the contractor. She hired him to fulfill her responsibility under the building permit to request inspections and ensure compliance with the codes. She had nothing to do with the permits.

Byron Hall, the Chief Building Inspector for the Metropolitan Government of Nashville and Davidson County, testified about the information possessed by the Codes Department. The self-building permit granted to Mrs. Calahan was never expanded to cover additional work performed beyond the description of constructing a 12 foot by 22 foot addition, remodeling a portion of the interior and adding a gable roof. The permit was canceled in June 2001. The framing failed an initial inspection but was subsequently approved. A plumbing permit related to the self-building permit was requested by the plumbing contractor for one water closet, one lavatory, and one shower drain. The permit indicated plumbing work had been rejected by an inspector, who noted the need for a permit for a second bathroom, unfinished and improper vents,[3] concern about nail plates for the PVC pipe, and need for access to the tub's pipes. There was no record of further inspections or final approval. Another plumbing permit was issued for a water closet, lavatory and tub. That one passed the initial "rough-in" inspection but noted that permits were needed for two water closets, two tubs, three lavatories, and one yard sewer. There was no record of a final inspection for this permit, and no record of any permits for the two water closets, two tubs, three lavatories, and one yard sewer. Permits for the electrical work and the security system related to the self-building permit were issued, and final approvals are noted on them. No permits were issued for the addition of a new kitchen, a sink, the addition of gas to the kitchen, or the HVAC systems.

The architect, William T. Bayer, testified that he provided advice and concept drawings but did not prepare full construction plans. All his contacts with the project were through Mr. and Mrs. Calahan.

Cindy Keane, Mr. Calahan's sister, testified that she spent summer vacations and Christmas vacations at the Calahans' house for ten years. She never witnessed sink backups, toilet backups or sewer smells. Jessica Renegar, Mrs. Calahan's mother, also testified that she visited the home often and stayed there for periods of 21 days and 7 days during her husband's illnesses and never experienced such problems.

---

[2] Mr. Everett Turner, Sr. died some time before this lawsuit.

[3] According to Mr. Hall, venting problems can lead to a sewer smell getting into the home.

David C. White, an employee of The Wills Company Incorporated, testified regarding the matters he believed were incorrectly done in the Calahans' renovation and the costs to correct them. Over objection by the Calahans' counsel, the chancellor found Mr. White qualified as an expert. He explained the cost estimates he provided to the Orndorffs to correct problems with the kitchen and powder room, the laundry, concrete and masonry, mechanical room, and gas. Mr. White testified to finding improper or absent venting,[4] improperly run water supply lines,[5] a drain line that was too small,[6] and an improperly supported drain line.[7] His testimony linked problems such as these to building code violations and the complaints of the Orndorffs. Mr. White's total cost estimate for repair was just over $60,000.00.

Mr. Orndorff testified about the finding and purchase of the house, including the receipt of the disclosure statement. He testified that had he known of the permit problem, he would not have bought the house.

Mr. Calahan and Mrs. Calahan testified that they had not experienced any problems with the new work. Mr. Calahan indicated he had no reason to believe at the time he filled out the disclosure form that there was any problem with the permits or building code. Mrs. Calahan also said she knew of nothing wrong. Both testified that they relied on Mr. Turner to take care of the subcontractors. Mr. Calahan referred to him as "the daily supervisor of the job."

Vernice and Richard Bryan were the real estate agents for the Calahans. They each testified about the contract negotiations and that they did not assist the Calahans in filling out the disclosure form.

The final witnesses were people who were frequent guests or residents in the Calahans' home. Karen White was the Calahans' son's homebound teacher. David Weyland is a behavioral specialist who visited the Calahans' home two to four times a week from 1998 until they moved in 2004. Eugene Basham actually lived in the Calahans' house from 2002 to 2004 and helped take care of their son. None of these people ever noticed any problems with the home.

The case was tried before the chancellor over four days, two in November 2006 and two in January 2007. She found in favor of the Orndorffs against the Calahans and awarded compensatory damages for repairs in the amount of $60,000.00, which she considered a conservative estimate of the cost of correcting the problems. She also awarded the Orndorffs attorney's fees and costs. In the

---

[4] See footnote 3.

[5] Some lines to a bathtub, commode and sink were routed through non-conditioned space.

[6] Mr. White testified that to have a kitchen sink and a dishwasher together "you have to have a two inch line penetrating the floor," and the line used was "an inch-and-a-half."

[7] According to Mr. White, a drain line must have a "continuous down gradient slope." The improper support allowed the drain line to sag.

oral ruling, the chancellor found that the Orndorffs "reasonably relied upon the disclosure documents." She said, "the defendants, the Calahans, misrepresented material facts when they recklessly and knowingly stated that they were not aware that the room additions, structural modifications, or other alterations or repairs were made without necessary permits. In fact, the Calahans knew that proper building permits had not been issued...." She further found that "the defendants, the Calahans, misrepresented material facts when they recklessly and knowingly stated they were not aware there were - - that room additions and modifications or other alterations and repairs were made not in compliance with building codes," and that they "breached the contract for sale when they warranted that the sewer and plumbing systems were in good working order." She noted the self-building permit indicated that the permit holder accepted full responsibility for code compliance and that the Calahans did not obtain all permits, inspections and approvals required. The chancellor traced all the problems with the property "to the absence of building permits and the failure of the Calahans to secure inspections that would indicate that their property complied with Metro building codes."

In her written judgment, the chancellor made a number of additional findings which further injured the Calahans' defense. The Calahans' building permit was cancelled on June 21, 2001. The chancellor relied on the testimony of the chief building inspector, who explained that one of the bathrooms did not have a permit for renovation. The chancellor stated:

> The vents were not finished and the water closet was not vented at all. He testified that there is inadequate venting in one of the new bathrooms also. Improper venting causes fumes back up and sewer odors. Permits were required for two added water closets, and two added bathtubs. One of the bathtubs had no vent and one bathtub was vented with the wrong material.

The chancellor further found:

> The Orndorffs carried their burden to show that the sewer connections at 403 [sic][8] Wilsonia are not in compliance with the building code as the result of the renovations by the Calahans. The building code requires a gradual decrease in the elevation of the pipe running from the toilet. The pipe in this house runs uphill from the toilet. The pipes running from the kitchen are overloaded and are constructed contrary to Metropolitan Code of Laws, 16.12.140 § 56 Table 3505.4.2. The pipe from the renovated kitchen and laundry area which carries away substantial waste is "scrunched" into a smaller pipe which results in the inability of the pipe to carry all the water. The plumbing was not originally designed for the modern laundry room and modern kitchen. Mr. Calahan testified that his general contractor advised him that the existing plumbing would be used for the renovated space.

---

[8]The address is actually 204 Wilsonia.

-5-

Mr. Calahan testified that during the renovations, his pattern for work was that he worked all week out of town and returned to Nashville each Friday for the week-ends. The Calahans testified that they did not know anything about the permits or inspections and they were not present for any of the inspections. Mr. Calahan stated that his only contact with Metro Codes was when he went to pull the permits.

The plumbing and sewer problems affected both the water flow in the house and the sewer functions. There was no permit for the expanded HVAC system and the temperature in the house could only be regulated by having both heat and air run at the same time.

The Calahans have an active social life. They hired several people to help with their disabled son and these people became their friends. These friends did not witness plumbing or sewer problems even though some of them stayed in the house overnight. The Court must find, however, that these friends were not using the plumbing systems and bathtubs as a person does who resided continually in a residence. The Orndorffs were credible witnesses. Their expert's testimony about the failed systems in the house is consistent with the records from the Metropolitan Codes Department and the testimony of the Metro chief building inspector.

Subsequently, the chancellor awarded the Orndorffs attorney's fees of $58,788.85 and discretionary costs of $5,019.20. The Calahans appealed.

### Standard of Review

The chancellor's findings of fact are reviewed de novo by the appellate court, with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Conclusions of law are reviewed de novo with no presumption of correctness. *Daron v. Dep't of Corr.*, 44 S.W.3d 478, 480 (Tenn. 2001).

### Analysis

The Calahans raise a number of issues on appeal.

#### I. Proof of Negligent or Intentional Misrepresentation and Fraud

Since the chancellor found the Calahans made "knowing" misrepresentations, we need not concern ourselves with proof of negligence.[9] As to intentional misrepresentation or fraud, the basic elements are as follows:

---

[9]Thus, we need not address the Calahans' issue of failure to prove negligence or negligence per se.

(1) an intentional misrepresentation with regard to a material fact; (2) knowledge of the representation falsity — that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity; (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) that the misrepresentation relates to an existing or past fact.

*Murvin v. Cofer*, 968 S.W.2d 304, 310 (Tenn. Ct. App. 1997) (quoting *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn Ct. App. 1990) (citations omitted). The Calahans concentrate their arguments on attacking the reliance element.

The Calahans claim that the Orndorffs did not establish that they reasonably[10] relied on the misrepresentations. The most significant argument the Calahans make in this regard is based on the language of the real estate contract itself: "[t]here are no oral or other collateral conditions, agreements or representations all such having been incorporated into this agreement. Buyer has not relied on any oral or written representations." This language, they maintain, indicates that the Orndorffs' reliance on the Tennessee Residential Property Disclosure Form[11] was not reasonable. We respectfully disagree.

The disclosure form is required for residential real property sales by Tenn. Code Ann. § 66-5-201 *et seq.* If the disclosure form was to have no significance, there would be no purpose in requiring it. "The Legislature must be presumed not to have intended to do a useless and vain thing." *Texas Gas Transmission Corp. v. Atkins*, 327 S.W.2d 305, 307 (Tenn. 1959). Indeed, the legislature intended purchasers to rely on the form: "The disclosure required by this part shall be provided to potential buyers for their exclusive use and may not be relied upon by purchasers in subsequent transfers from the original purchaser who received the property disclosure." Tenn. Code Ann. § 66-5-201. The disclosure must be given in good faith by the owner. *Id.* The law clearly states that the owner can be liable for misrepresentation or nondisclosure. Tenn. Code Ann. § 66-5-208. It also describes circumstances when errors or omissions do not create liability. Tenn. Code Ann. § 66-5-204. A home is often the largest purchase in people's lives and, consequently, their most significant asset. The disclosure requirement was intended to assist potential home buyers in making the purchasing decision. We do not believe the statutorily required Tennessee Residential Property Disclosure Form is the type of "written representation" envisioned by the contract.

The Calahans argue there was no reliance on the disclosure form because the Orndorffs had not seen it when the first offer was made. They did, however, see it before the contract negotiations were completed. Mrs. Orndorff testified that had they been aware of any such problems they would have terminated the contract and not purchased the property. Mr. Orndorff testified that had he

___

[10]The Calahans' brief uses the term "justifiably" relied. We choose to use the term "reasonably" because that is the word used in *Murvin*. The Calahans' take the term "justifiably" from *McNeil v. Nofal*, 185 S.W.3d 402, 408 (Tenn. Ct. App. 2005). The *McNeil* court relates justifiable reliance with reliance that was reasonable. *Id*. at 408-09.

[11]The Calahans also say the Orndorffs could not rely on the MLS listing or any statements made by the Calahans' real estate agent. Since the chancellor did not focus on these as areas of reliance, we will not do so either.

known of the permit problem, he would not have bought the house. There is no evidence contradicting the Orndorffs' statements that they relied on the disclosure form.

It also appears that the disclosure form was incorporated into or at least recognized by the contract. Exhibit three is the contract with certain disclosures and consists of four pages. The first page contains the real estate agency's disclosure, the buyers' acknowledgment of receipt of the sellers' property condition disclosure and the lead-based paint disclosure acknowledgment. This first page is labeled "Page 1 of 4." Page two states near the top, "CONTRACT FOR SALE OF REAL ESTATE." Page 2 is labeled, "Page 2 of 4." Thus, the parties acknowledged the integral part the disclosure played in the transaction.

The Calahans further attack the Orndorffs' reasonable reliance on the disclosure statement by observing that the Orndorffs knew of the renovation and therefore were put on notice that they should check with the Metro codes authorities. Since the disclosure document itself said that the Calahans were not aware of any code or permit problems, it cannot be said that the Orndorffs were ever put on notice of these problems. One cannot infer such problems from the mere knowledge of a renovation that occurred four years before the purchase of the house.

Finally, the Calahans argue that reliance on the disclosure form is not reasonable because the Orndorffs had a home inspection done before closing. The inspection, however, did not cover structural issues or building code compliance. The Orndorffs did not have a more extensive inspection because they never had any indication or reason to believe that there was any problem with the structure or with building code compliance. Under such circumstances, a home inspection does not relieve the Calahans of responsibility for their misrepresentations. *Staggs v. Sells*, 86 S.W.3d 219, 224 (Tenn. Ct. App. 2001) (sellers not relieved for misrepresentations regarding flooding even though buyer performed inspection of property).

We find that the preponderance of the evidence fully supports the chancellor's findings.

## II. Breach of contract

The chancellor found that "[t]he defendants breached the contract for sale when they warranted that the sewer and plumbing systems were in good working order." The Calahans maintain that there was no breach of contract on their part.

The pertinent portion of the contract states:

CONDITION OF PREMISES: Seller warrants that all built-in kitchen appliances, electrical systems and fixtures, window air conditioning units, heating and air conditioning equipment, plumbing and plumbing fixtures (including water heaters, sewer and septic systems), fireplace and chimneys, security systems, swimming pool and its related equipment (if included in this sale) shall be in proper functioning order and good state of repair and that the roof will be free of leaks as of the date of closing

or date of possession whichever is later. In addition to the inspection rights contained in the preceding paragraph, Buyer shall have the right and responsibility to inspect the items described in this paragraph prior to closing. Any required repairs resulting from problems occurring after the inspection made pursuant to the preceding paragraph shall be made a Seller's expense prior to closing. Closing of the sale constitutes acceptance of these items by Buyer.

The preceding paragraph provides for a property inspection. It contains the following language: "Neither Seller nor Seller's agent shall have any liability for the condition of the property after closing. Seller shall not be responsible for conditions first becoming known or occurring after closing."

The right of inspection means very little if the persons with that right are misled into believing there is no need to do so. Regardless of the Orndorffs' right of inspection, the Calahans warranted in the contract that the heating and air conditioning, the plumbing and plumbing fixtures and the electrical systems were in "proper functioning order." It is clear from the evidence that the causes of the problems encountered by the Orndorffs existed prior to the closing and were not "first known" by the Orndorffs. All of the problems experienced by the Orndorffs are traceable to the Calahans' failure to secure the permits and inspections that would ensure that their property complied with Metro building codes. The chancellor was correct in her determination that the contract had been breached.

### III. The main sewer pipe

The Calahans maintain that "[m]ost of the plumbing problems testified to by the Plaintiffs are cause [sic] by a sag or swag in the main sewer pipe," and that there is no proof that the Calahans knew of any defect in the main sewer pipe. This is a drastic understatement of the evidence. The record is replete with testimony of improper venting, improper support of drain pipes, incorrect pipe sizes, and failure to secure permits and inspections which would have revealed these and other problems. The Calahans' argument in this regard is utterly devoid of merit.

### IV. Testimony of the expert witness

The Orndorffs used David C. White as an expert witness. The Calahans challenge Mr. White's qualifications as an expert. They note that he is not a licensed contractor, plumber, or electrician. He had never been employed to testify in any other proceeding. Mr. White was employed by the Wills Company, which specializes in renovation and repair work, to go to potential job sites, identify the problems, and come up with solutions. These facts, claim the Calahans, do not qualify a person to testify as an expert on plumbing and other construction matters.

The value of experts is that they have specialized knowledge that can aid the trier of fact to understand the evidence or determine a fact in issue. Tenn. R. Evid. 702 states: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the

evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Experts often apply their expert knowledge to facts they themselves have observed or have been otherwise provided. This is what Mr. White did in the matter at hand.

The question the Calahans raise is whether Mr. White is qualified to be an expert in this case "by knowledge, skill, experience, training , or education." Mr. White testified at great length about his experience, his current job and his familiarity with code compliance. He was 34 years old at the time of trial. After college, he worked for several contractors in the St. Louis area. Since moving to Nashville, he had worked for The Wills Company for eight years — the first five years as a project manager and since then in "handyman sales." His job is to go to potential customers' homes or properties, find out what their problem is, determine what is wrong, develop a plan to correct the problem, and generate a quote sheet by consulting with the company's subcontractors and suppliers. He testified that, due to the nature of what he does, he has to be very familiar with the building codes regarding construction, electrical, plumbing and HVAC.

The chancellor found Mr. White to be qualified to testify as an expert. The appellate courts do not overturn such decisions unless the trial court abused its discretion. *Freeman v. Blue Ridge Paper Products, Inc.*, 229 S.W.3d 694, 708 (Tenn. Ct. App. 2007). "A trial court abuses its discretion if it applies an incorrect legal standard or reaches an illogical or unreasonable decision that causes an injustice to the complaining party." *Id.* (quoting *Brown v. Crown Equip. Corp.,* 181 S.W.3d 268, 273 (Tenn. 2005)). We find no abuse of discretion in permitting Mr. White to testify as an expert.

V. Speculative Damages

The chancellor awarded damages of $60,000.00 based on Mr. White's testimony. The Calahans argue that $15,500.00 of this award was "pure speculation." These damages are amounts estimated by Mr. White for repairing problems he could not see, but which he anticipated could occur due to unknowns such as bedrock, necessary replacement of underground sewer pipes and the demolition and replacement of concrete.

Of course, courts should not award speculative damages. *Redbud Coop. Corp. v. Clayton*, 700 S.W.2d 551, 561 (Tenn. Ct. App. 1985). "However, uncertain or speculative damages are prohibited only when the *existence* of damages is uncertain not when the *amount* of damage is uncertain." *Id*. (emphasis added). In this case, there is undoubtedly considerable damage that must be repaired. Some of it is hidden by flooring, concrete and soil, preventing a more definitive determination of repair cost. A damages award may be based on the estimated costs of repair. *Id*. at 561 n.20. The chancellor considered the $60,000.00 award a conservative estimate of the cost of

correcting the problems. We affirm the chancellor's award, which is supported by a preponderance of the evidence.[12]

## VI. Pleading of Building Codes

Another argument raised by the Calahans is that the Orndorffs failed to properly plead the Metropolitan ordinances containing the building codes. Tenn. R. Civ. P. 8.05(1) states in pertinent part: "The substance of any ordinance or regulation relied upon for claim or defense shall be stated in a separate count or paragraph and the ordinance or regulation shall be clearly identified. The manner in which violation of any statute, ordinance or regulation is claimed shall be set forth." After the trial had begun, the Calahans filed a motion to prohibit the Orndorffs from using the Metro ordinances and building codes as evidence.

The gravamen of the Orndorffs' complaint is that the Calahans failed to secure the required permits and inspections for the renovations to their home. This is clear from the complaint. The Orndorffs did not specifically identify the ordinances or regulations involved. The Tennessee Supreme Court has interpreted Tenn. R. Civ. P. 8.05(1) to require citation to specific regulations alleged to be violated. *Polings v. Goins*, 713 S.W.2d 305, 306 (Tenn. 1986). Thus, the Orndorffs erred by not pleading the ordinance or building code regulations alleged to have been violated.

In an order entered November 21, 2006, the chancellor decided to take judicial notice of the Metro Building Code provisions pursuant to Tenn. R. Evid. 202.[13] Since notice to the adverse party is required, the chancellor ordered the plaintiffs to provide the defendants with notice of their intent to rely upon specific Metro Code provisions. This notice was served on December 6, 2006. A week later, the Calahans filed a motion objecting to the use of the building codes as evidence, or in the alternative, seeking an order prohibiting the use of the ordinances and building codes as evidence, or in the alternative, seeking a continuance to retain an expert to testify at trial.[14]

In response to the motion, the chancellor expressly found that "[t]he Complaint adequately informs the Defendants clearly in numerous paragraphs of the claims against them and the nature of the violations of the Metro Building Code at issue in this action, without citing the specific provisions," and "the Defendants have not been prejudiced in any manner not allowable under the Rules of Civil Procedure . . . ." In addition, the chancellor found that the defendants had "made no objection regarding Plaintiffs' pleadings, Plaintiffs' reference to the Metro Building Codes, or the manner in which Plaintiffs submitted the Metro Building Codes into the record, until the time that

---

[12]We note that Mr. White's five estimates (kitchen and powder room, laundry, concrete and masonry, mechanical room, and code related repairs: gas) total $60,363.33. The chancellor obviously discounted this estimate somewhat.

[13]Tenn. R. Evid. 202(b) states: "Upon reasonable notice to adverse parties, a party may request that the court take, and the court may take, judicial notice of . . . (3) all duly enacted ordinances of municipalities or other governmental subdivisions . . . ."

[14]The chancellor denied the continuance in order to hire an expert and the Calahans do not challenge that ruling.

Defendants filed this Motion after trial had begun," and "Defendants had sufficient opportunity during the litigation to depose Plaintiffs' expert as to the identification of applicable ordinances and Metro Building Code [sic] during Defendants' discovery deposition of Plaintiffs' expert." Finally, in light of the entire record and the arguments of counsel, the chancellor found that the Calahans had notice of the building code violations.

In essence, the chancellor said that if the Calahans had a problem identifying the appropriate ordinances and regulations, it was a problem of their own creation by failing to depose the Orndorffs' expert about the codes and by waiting until after the trial had begun to raise the issue. This court is not required to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). We find no error in the chancellor's exercise of discretion regarding judicial notice of the building codes.

VII. Attorney fees and costs

The Calahans maintain that the award of attorney's fees and costs should be set aside because they should have won the case. As this opinion shows, we respectfully disagree. Therefore, we affirm the award of attorney's fees.

Conclusion

The judgment of the chancellor is affirmed in all respects. Costs of appeal are assessed against appellants Edward Ron Calahan and Diane R. Calahan.

_____
ANDY D. BENNETT, JUDGE