FILED
02/08/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 9, 2017 Session

**VICTORIA LEANNE POTTS v. TIMOTHY S. POTTS**

**Appeal from the Circuit Court for Hamblen County**
**No. 13-CV-179      Thomas J. Wright, Judge**

_____

**No. E2016-02283-COA-R3-CV**

_____

This appeal involves a contentious continuing dispute over visitation with the parties' young daughter. After numerous hearings, the trial court reluctantly continued limited structured visitation to the mother. The principal issue raised on appeal is whether the trial court's rulings were in the best interests of the child. Having carefully reviewed the voluminous record before us, we find that the evidence supports the parenting plan determination and other rulings made by the court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, C.J., joined.

Dawn E. Bowie, Knoxville, Tennessee, for the appellant, Victoria Leanne Potts.

Frank C. Little, Knoxville, Tennessee, and Linda Larson, Dandridge, Tennessee, for the appellee, Timothy S. Potts.

**OPINION**

**I.  BACKGROUND**

This case involves the dissolution of a marriage of short duration. Victoria Leanne Potts ("Wife") and Timothy S. Potts ("Husband") were married on October 11, 2008. In June 2012, the couple had a daughter ("the Child"). After the Child's birth, Wife became seriously ill with postpartum depression and developed a serious eating disorder. Despite working with a therapist starting in July 2012, Wife's treatment was unsuccessful. Her

primary care physician prescribed Zoloft, but the drug proved of no benefit in addressing Wife's mental health issues. In February 2013, Wife entered an intensive outpatient treatment program in Knoxville. Four months later, she received further inpatient treatment in Knoxville for a period of 18 days, at which time a feeding tube was inserted to ensure Wife's sufficient nutrition. She subsequently entered an inpatient program in Chattanooga, then transitioned to a related outpatient program in Knoxville. Eventually, she received further treatment in Indiana, Florida, and Colorado. Over the course of her illness, Wife was diagnosed, *inter alia*, with clinical depression, obsessive-compulsive disorder, and anorexia.

Wife, in her early thirties at the time of these events, has been enrolled at the University of Tennessee in pursuit of a degree in social work.[1] She possesses a BA in education from a college in Florida and was previously employed full time as a teacher in a private school. However, because her degree is from an unaccredited institution, she has been unable to obtain a job with a public school system in Tennessee. The record reveals that Wife had completed a semester of course work toward obtaining a masters in education in order that she could be certified to teach in Tennessee public schools, but she abandoned that course of study when she became pregnant with the Child. Husband's educational background reveals two years of community college education. Six years older than Wife, Husband works as a mine clerk for Nyrstar Tennessee Mines.

Wife contends that her mental health issues result from abuse, first from her father and later by Husband. In regard to Husband, Wife asserts that he "is emotionally abusive and has severe anger management issues." She contends that Husband's "abusiveness" exacerbated her mental health problems, leaving her in constant fear that she would trigger his anger. She claimed to feel unsafe in his presence. According to Wife, Husband raised his voice in anger, once grabbed her by the arm, once grabbed her by the shoulders, hit her with a pillow, obstructed the doorway to their bedroom and locked her in the bathroom while she was holding the Child. On the occasion where she was holding her daughter, Wife testified that Husband refused to allow her to pass unless she admitted that she had lied. She claims that he would call her selfish, lazy and irresponsible, constantly harassed her, yelled at her, and used terrible language—all in the presence of the Child. Additionally, Wife asserts that Husband isolated her and constantly blamed her. She contends that he often threatened to leave her, poked her, and pointed his finger in her face. Wife admitted, however, that she had also grabbed Husband by the arm once and had hit him with a pillow.

As to Wife's allegations, Husband admits that he once grabbed Wife's arm, once grabbed her by the shoulders, hit her with a pillow and once stood in the doorway of their bedroom during an argument. He acknowledges calling her "irresponsible" during an

___

[1]Because of her battles with depression and an eating disorder, Wife expresses a desire to help other people who are battling those maladies.

argument about money. According to Husband, however, he was unaware that Wife thought he was abusive. He observed that the subject of abuse had never come up in any of Wife's treatment and that none of the providers had ever attempted to address the possibility with him or to encourage him to seek treatment. Contrary to Wife's assertions, Husband contends that he encouraged her to initiate mental health treatment and was a source of support until she filed for divorce. He paid all of the household expenses including Wife's health insurance, car payment and car insurance, cared for the Child,[2] took care of almost all of the household chores, and regularly drove to Knoxville or Chattanooga during the inpatient admissions to enable Wife to see the Child. Wife, however, asserts that Husband was very uncooperative during her treatment and refused to follow the advice or instruction of the therapists.

During his spouse's treatment, Husband contends that he came to believe Wife posed a risk to the Child. He worried that her insistence on breast feeding and limited caloric intake was harming the Child. Husband's mother testified that she had seen the Child stick her fingers down her throat to gag herself, suggesting the infant had observed her mother perform the action. Husband filed a petition for emergency custody of the Child in the juvenile court before Wife's divorce complaint was filed in the circuit court on August 28, 2013.

After the juvenile court exercised jurisdiction over the custody of the Child, a probable cause hearing was held on September 4, 2013, wherein the court found probable cause to believe that there was a substantial threat of harm to the Child while in the unsupervised care of Wife. The juvenile court noted:

> There is probable cause to believe that [the Child] could be under a substantial threat of harm if placed in your care and control presently. And the reason I say that is because of the suicidal thoughts that you had. I'm going to have to have some expert testimony who knows that you had thoughts while you were driving down the road that you thought about running off the road and killing yourself, and that the only reason you didn't do that was because [the Child] was in the car. I just can't trust that. It's up to me to see that children are protected, and this is a probable cause hearing.
>
> Also, I am very concerned about [the Child]'s birth [sic] weight. It appears that you are compulsive about how much her food intake is and that perhaps you have restricted it to too great of an extent, because she was actually only at the five percentile once upon a time. . . .

In spite of its concerns regarding Wife, the juvenile court found Husband had been too

---

[2]Wife argues that Husband's mother, not Husband, served as caregiver.

restrictive with visitation. The court thereafter entered an order transferring the juvenile court case and consolidating it with the divorce action pending in the circuit court.

Wife continued to receive treatment and she asserted that her condition was improving. In August 2013, a medical doctor observed that Wife was responding well to treatment and that "[a]t no time ha[d] [Wife's] illness interfered with her ability to care for her daughter." The physician indicated that Wife put her daughter's needs before her own and had "never been psychotic or had any wish or impulse to harm anyone." By October 2014, a therapist indicated that Wife's "mood is stable," that she had "appropriate thought processes, and is capable of using good judgment." The therapist found "no reason there should be any restrictions in [Wife's] interactions with her daughter." Another therapist opined that Wife "represented[ed] NO risk to herself or others, including specifically her 2-year-old daughter." In contrast, Dr. James F. Murray, Ph.D., testified that he was extremely concerned about Wife's ability to safely and appropriately parent the Child. Dr. Murray, who was engaged as an expert for the court at the request of Wife who paid for Dr. Murray's evaluation, recommended minimal supervised visitation for Wife with Husband as the primary residential parent and sole decision maker because her mental health issues are "characteristically difficult to treat in a comprehensive fashion, likely to recur, and likely to significant[ly] impact or limit adaptive/functional capacity across a number of important life dimensions."

In December 2014, the trial court granted the divorce, reserving the co-parenting issue along with the child support issue. Pursuant to Tennessee Code Annotated section 36-4-129(b), the court stated as follows:

> [B]oth parties have been involved in a course of conduct over the past two years that caused their relationship to disintegrate and their love and affection for one another to be extinguished. For the wife's part, this finding flows from her inability to fulfill her roles as a parent and a wife over the year prior to filing for divorce and from her determination that husband was an abuser who failed to support her during her battle with mental illness. For the husband's part, this finding stems from his inability to maintain an emotional attachment to his wife during her lengthy treatment and his determination that she was untrustworthy and a threat to their child, as evidenced by his initiation of ex parte juvenile court proceedings to prevent the wife from being unsupervised with the child. . . .

It appears that Wife's condition has stabilized and no additional inpatient or intensive outpatient treatment has occurred.

The final disposition of the case occurred in August 2016. At that time, Wife had been visiting regularly with the Child under the supervision of the Assurance Group in Knoxville. Becky Cook, the operations director at the facility, testified regarding the

interaction between the Child and Wife: Wife "has done nothing that causes me concern." Ms. Cook noted that the visits go well and an affectionate bond exists between them. A licensed professional counselor who had been working with Wife for about a year and a half, Martha Finnegan, observed that Wife has made significant progress regarding her depression and that her medication had been decreased. Ms. Finnegan expressed no concerns about Wife's parenting skills and being around her daughter. She opined that Wife "would never harm" the Child. The court described "recent activities and interaction between [Wife and the Child as] appropriate with no words, actions or inactions to cause any concern for the supervised visitation supervisor."

In the memorandum opinion filed by the trial court, it was noted that "[a] separate order was filed December 12, 2014 [that] contains extensive findings which are hereby incorporated by reference. . . . That order from December 12, 2014 is an integral part of this Court's findings, conclusions, and rulings on the issues in this divorce." The court found in the prior order that the preponderance of the evidence did not support Wife's allegations that she had been "abused" by Husband. In the September 2, 2016 order, the court addressed the "significant progress" Wife had made in addressing her mental health issues. According to the court,

> one indication of the positive progress [Wife] has made is that she has remained stable in the midst of what has to be an excruciatingly stressful situation. The psychologist who testified at trial indicated that symptoms from the various maladies suffered by [Wife] would tend to be exacerbated or become symptomatic when [Wife] is placed under stress. It is difficult to imagine a more stressful period than what she has been going through fighting for visitation with her daughter, having to be observed during all of her parenting time, having her parenting unilaterally terminated by Father on more than once occasion, receiving an extremely negative parenting evaluation from the Court's expert, appearing, and often testifying, at numerous court proceedings, all the while maintaining a part time job, taking college courses, taking care of her own home and attending to her mental health treatment. It is difficult to imagine that she will ever be anymore stressed than she has been during this time period. Yet, she has improved and has a significant period of demonstrated stability.

Despite the improvement by Wife, the court specifically held:

> Clearly the most significant issue in the case has been [Wife's] mental and emotional health. Her illness has simply precluded her from being involved at all for lengthy periods of time in the life of this child. And the concerns that her illness has raised prevent her from enjoying normal parenting time with this child despite her significant improvement during the last year. Because of the child's age and stage of development and the severity and

- 5 -

seriousness of the illnesses experienced by [Wife], it is with regret that the undersigned FINDS the best interest of the child to be served by a period of continued supervised visitation on the part of [Wife]. *See* Tenn. Code Ann. § 36-6-406(d)(1) & (2). In this situation, there is no question that the [Husband] must be the primary residential parent. Because the parties are unable to agree on anything, someone must be designated as the decision maker and in this case it must be [Husband], due to concerns about decisions [Wife] has made or attempted to make in the past about the Child's mental and physical health, eating habits and need for evaluation, therapy, and treatment.

Wife filed a timely appeal.

## II. ISSUES

The issues raised on appeal by Wife are restated as follows:

> a. Whether the trial court conducted a meaningful comparative fitness evaluation based on the best interest of the Child.
>
> b. Whether the evidence below preponderates against the findings and conclusions of the trial court.
>
> c. Whether Wife was denied due process of law because of her mental illness, which could have been avoided by application of a clear and convincing evidentiary standard of proof in very narrow circumstances:
>
> 1. Whether under any standard Wife was denied procedural due process.
>
> 2. Whether the use of the clear and convincing standard of proof for restricting parental rights in custody determinations would provide better protection from inherent, unconscious bias against parties vulnerable to the stigma of mental illness.

## III. STANDARD OF REVIEW

Our review of the trial court's factual findings is de novo upon the record of the trial court, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." *See* Tenn. R. App. P. 13(d); *Kendrick v.*

*Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002). We review the trial court's resolution of questions of law de novo, with no presumption of correctness. *Kendrick*, 90 S.W.3d at 569. Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007) (internal citations omitted). A trial court's decision regarding the details of a parenting plan should not be reversed absent an abuse of discretion. *Eldridge v. Eldridge*, 42 S.W.3d 83, 88 (Tenn. 2001).

## IV. DISCUSSION

### a. Motion to Dismiss

The trial court granted the divorce in this matter in December 2014; the issue of child custody, *inter alia*, was reserved. The remaining issues between the parties--parenting time, child support, and alimony--were addressed in the trial court's memorandum opinion and final judgment order entered on September 2, 2016 ("the Order").

Husband observes that the Order set forth a detailed residential parenting schedule regarding the Child, which took effect on the date of its entry. It stated: "Counsel for Mother shall prepare a permanent parenting plan reflecting the rulings herein and submit to the Court. The 8-month visitation progression starts with the filing of this Memorandum Opinion and Final Judgment Order." Thereafter, Wife's counsel drafted and submitted a parenting plan as directed, which was signed and entered into the trial court's record on October 21, 2016. Wife filed a notice of appeal on November 14 from

> [T]he final judgment of the Circuit Court for Hamblen County, Tennessee (Parenting plan Order incorporating Memorandum Opinion of September 2, 2016 into a final order) entered in this Court's record on October 21, 2016.
> . . .

Husband now contends that Wife's notice of appeal is untimely because the final order was the trial court's September 2 Order rather than the October 21 Order. He asserts that the September 2 Order resolved all of the outstanding issues between the parties. According to Husband, the later filed parenting plan is not an operative order but simply a restatement of the same residential parenting schedule that was set forth in the September 2 Order.

Wife responds that "[a]ny final decree or decree of modification in an action for absolute divorce, legal separation, annulment, or separate maintenance involving a minor child **shall incorporate** a permanent parenting plan . . . ." Tenn. Code Ann. § 36-6-

404(a) (emphasis supplied). She contends that the September 2 Order was not the final decree of divorce as several matters were not addressed in the court's memorandum opinion and order that were set forth in the permanent parenting plan order filed on October 21, 2016. According to Wife, neither order, standing alone, was sufficient to conclude all issues between the parties.

"[E]very final decree in a divorce action in Tennessee involving a minor child must incorporate a permanent parenting plan." *See Armbrister v. Armbrister*, 414 S.W.3d 685, 696 (Tenn. Oct. 21, 2013); Tenn. Code Ann. § 36-6-404(a). Creating a parenting plan is one of the most important decisions confronting a trial court in a divorce case. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001).

Tennessee Code Annotated section 36-6-402(3) defines a permanent parenting plan as: "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule, as well as an award of child support consistent with chapter 5 of this title[.]" Tennessee Code Annotated section 36-6-404 lists the specific elements that the trial court must include in the written plan which constitutes a permanent parenting plan. Husband contends that the trial court's September 2 Order addressed every element required by statute to be included in a permanent parenting plan with the exception of selecting a process for dispute resolution. According to Husband, in the relevant section of the permanent parenting plan that was submitted by Wife's counsel, the box for "Mediation by a neutral party chosen by the parents or the Court" was selected. He argues that the trial court's omission of this minor detail in the Order is of no substance with regard to the parties and is therefore inconsequential. Husband further contends that there is no statute or rule indicating that the parenting plan "form" set forth by the Administrative Office of the Courts ("AOC"), pursuant to Tennessee Code Annotated section 36-6-404(3)(d), is the only format which constitutes a permanent parenting plan. Husband argues that the court's September 2 Order is a permanent parenting plan as defined by Tennessee Code Annotated section 36-6-402(3), and thus, meets the requirements of Tennessee Code Annotated section 36-6-404(a)-(b).

A final judgment is primarily one that fully adjudicates all the matters existing between all the parties. Tenn. R. App. P. 3(a); *Wilson v. Wilson*, 58 S.W.3d 718, 725 (Tenn. Ct. App. 2001). Until a judgment becomes final, it remains within the trial court's control and may be modified any time prior to the entry of a final judgment. *Eldridge v. Eldridge*, 137 S.W.3d 1, 20 n. 10 (Tenn., Ct. App. 2002).

Upon review, we note that rights are included in the permanent parenting plan that are not addressed in the September 2 Order. Thus, we find the appeal to be timely filed. The September 2 Order did not resolve all the disputed matters in the pending litigation. Further, Tennessee Code Annotated section 36-6-404(3)(d) notes that the AOC's "parenting plan" form "shall be used consistently by each court within the state that

approves parenting plans." Accordingly, the judgment was not final without the required mandatory form. Husband's motion to dismiss is denied. Wife's request for attorney fees and costs incurred in defending the motion to dismiss, however, is also denied.

### b. Best Interest

Wife argues that the trial court, distracted by Husband's contentions about her mental health, made a custody determination that was not in the best interest of the Child. She contends that the trial court conflated a custody evaluation ("the purpose of which is to focus on factors that pertain specifically to the psychological best interests of the child") with a forensic psychological evaluation ("the purpose of which is to evaluate and report on the clinical mental status of individuals in the legal system."). Wife asserts that little information was developed to address what the psychological best interests of the Child might have been. Wife further argues that the trial court improperly applied the Tennessee Code Annotated section 36-6-106 factors. Accordingly, she claims that the evidence of record preponderates against the trial court's ruling. Husband responds that the court followed the appropriate procedures and had sufficient evidence with which to set a parenting schedule that was in the Child's best interests.

The trial court is not required to list and discuss each factor enumerated in Tennessee Code Annotated section 36-6-106. As this Court has explained:

> Ascertaining a child's best interests does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005). The trial court in the instant case expressly considered all of the statutory factors. Specifically, the court stated in its memorandum opinion:

> In determining the child's best interest there are a number of factors that must be considered in every case, including fifteen specifically listed factors in T.C.A. § 36-6-106(a). *See also*, T.C.A. § 36-6-404(b). Having carefully considered all of the statutorily mandated factors, the Court FINDS the following statutory factors from § 36-6-106 to be of primary importance in determining the primary residential parent as well as the terms of a permanent parenting plan.

The court determined that Husband had been the primary provider and caregiver for the

daily needs of the Child and that he had a loving and stable relationship with his daughter. Despite the court's acknowledgment of the Child's loving and evolving relationship with her mother, the court concluded that concerns about Wife's illness prevent her at this time from enjoying normal parenting time with the Child. The court did not dispute Wife's improvement but found the Child's age and stage of development and the severity and seriousness of Wife's illnesses to require supervised visitation for Wife to be in the Child's best interests.

Interestingly, the court expressed its concern about Husband's disdain for Wife's role in the Child's life, citing Husband's adoption of Dr. Murray's negative conclusions about Wife. The court specifically noted:

> [Husband] has latched on to the negative conclusions reached by Dr. Murray regarding [Wife]'s parenting ability without recognizing that [Wife] has spent the last year and a half functioning well, in a continuing therapeutic relationship, at a minimal level of treatment, without any inpatient or even intensive outpatient treatment being necessary. At trial [Husband] could not even bring himself to acknowledge that she had improved much less say that he was glad she was doing better. While embracing Dr. Murray's negative conclusions about [Wife] as if they were the Holy Grail, [Husband] completely ignores Dr. Murray's cautionary statement that his recommendations be subject to revision to consider positive changes in [Wife's] health and functioning.

The record reveals that the trial court conducted a thoughtful and thorough and unbiased assessment of the relevant facts of this case and made a custody determination that was in the best interests of the Child.[3] The court made findings that Wife's therapist Ms. Finegan was "helpful and credible" and observed that she "would have no concerns about [Wife] appropriately parenting [the Child]." In contrast, the court considered Dr. Murray's testimony that he was extremely concerned about Wife's ability to safely and appropriately parent the Child and recommended minimal supervised visitation for Wife with Husband as the primary residential parent and sole decision maker. Despite Dr. Murray's testimony, the court recognized that the psychologist did not have the benefit of re-interviewing Wife after her recent period of stability, and that she had made significant progress since his evaluation. The court further acknowledged that it would be difficult to imagine that Wife will ever be anymore stressed than she has been during this time period.

---

[3]Statute addresses "a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors." Tenn. Code Ann. § 36-6-106(a).

Trial courts are in a better position to observe the witnesses and assess their credibility; therefore, trial courts enjoy broad discretion in formulating parenting plans. *Massey-Holt*, 255 S.W.3d at 607. "Thus, determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.'" *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988). Appellate courts should not overturn a trial court's decision merely because reasonable minds could reach a different conclusion. *Eldridge*, 42 S.W.3d at 85. Based upon our review of the record, we hold that the evidence does not preponderate against the trial court's findings of fact, and we find no error in the court's parenting plan determination. We recognize, however, that "supervision of a parent's visitation with his or her child is "a significant intrusion on the parent-child relationship," "is not to be undertaken lightly or without reasonable basis," and a court "should seek to end the supervision as soon as it is no longer needed." *Culbertson v. Culbertson*, 455 S.W.3d 107, 157 (Tenn. Ct. App. 2014).

### c. Abuse

Wife asserts that the trial court was premature in its finding that Husband did not abuse her. She contends that the court's finding foreclosed inquiry during the comparative fitness analysis into the code provisions requiring the court to "consider evidence of physical abuse . . . to the other parent . . . ." Tenn. Code Ann. §§ 36-6-106(a)(8) & 36-6-404(b)(12). The trial court found that "[t]here is absolutely no evidence that [Husband] inflicted or attempted to inflict physical injury or that the words or actions of the husband should have placed wife in fear of physical harm or restraint. While the husband's words and actions during some of the couple's arguments may have been unappreciated and unwelcomed they would not have placed a reasonable person in fear of injury or restraint."

Tennessee Code Annotated section 36-3-601(1) defines abuse as:

[I]nflicting, or attempting to inflict, physical injury on an adult or minor by other than accidental means, placing an adult or minor in fear of physical harm, physical restraint, malicious damage to the personal property of the abused party, including inflicting, or attempting to inflict, physical injury on any animal owned, possessed, leased, kept, or held by an adult or minor, or placing an adult or minor in fear of physical harm to any animal owned, possessed, leased, kept, or held by the adult or minor[.]

Ironically, Wife admitted that she grabbed Husband's arm in order to prevent him from leaving their house and also struck him with a pillow because she was frustrated with him, thus committing against Husband actions similar to ones that she asserts are abuse when committed by her spouse. It is clear that the relationship between the parties had deteriorated beyond repair. Our review of the record, however, reveals that the trial court properly weighed the facts before it before finding that there was no abuse by

- 11 -

Husband.  The preponderance of the evidence supports the findings of the trial court regarding alleged abuse.

### d. Dr. Murray

Despite the fact that she agreed to the selection of Dr. Murray to conduct a parenting evaluation, Wife now contends that he was unqualified to conduct the evaluation.  She specifically contends that the evaluation was not performed pursuant to the guidelines of the American Psychological Association that "the child's welfare is paramount" and did not provide any information about "parenting attributes, the child's psychological needs, and the resulting fit."  *See* American Psychological Ass'n*, Guidelines for Child Custody Evaluations in Family Law Proceedings*, 65 American Psychologist, No. 9, 865-867 (2010).  Husband submits that the parties stipulated at trial to Dr. Murray's qualifications as an expert witness.  The trial court reviewed Dr. Murray's curriculum vitae and expressly found:

> [S]ince the plaintiff[] [Wife] selected him [Dr. Murray] to do the evaluation I'm going to find that he's able to testify about opinions with regard to mental health, mental illness, child and parent interactions and any related issues that he was asked to observe the parties about.  So he's . . . he's an expert.

Dr. Murray testified that Wife "continues to have very severe, very significant psychiatric symptomatology." He observed that Wife

> is so focused on her own psychological pain and her own symptoms, which she uses, which will cause her pain and are the only mechanisms that she knows how to relieve the pain, that she can't see [the Child] as [the Child]. And she can't separate her own needs from [the Child]. . . . And so I think she just is so encompassed in her experience of pain and victimization and eating disorders and maladaptive ways of handling depression and anxiety that she can't look at somebody else and say this is somebody else, this is who they are, this is what they need and don't need.  Let me take my stuff and pack it away and fit in with this person.  She can't.  I don't believe she can do it.

In summary, Dr. Murray opined that Wife is so consumed by psychological symptoms and pain that it is difficult for her to live a life separate from her symptoms.  He further expressed the belief that Wife's mental health condition directly impacts in a negative way her ability to parent the Child.  Dr. Murray recommended that Husband be identified as the primary residential custodian with sole decision capacity for all significant issues. He proposed that Wife have regular scheduled visitation with the Child for 2 hours one weekday afternoon or early evening each week and a 4 hour supervised period every

other weekend, supervised by a licensed mental health professional to be selected by Husband. Admittedly, by the conclusion of the case, the trial court observed that Dr. Murray's "opinions and his parameters are starting to deteriorate a little bit with me."

When determining the admissibility of expert testimony, the role of the trial court is that of a gatekeeper. *State v. Scott*, 275 S.W.3d 395, 401 (Tenn. 2009). Questions pertaining to the qualifications, competency, admissibility and relevancy of expert testimony are left to the discretion of trial court. *Brown v. Crown Equipment Co.*, 181 S.W.3d 268, 273 (Tenn. 2005).

As noted by Husband, Wife never objected to Dr. Murray's qualifications or the extent of the trial court's order appointing him. Wife was well-represented at the trial court by experienced counsel. She may not now raise objections that were not raised in the trial court simply because Wife has new counsel. An issue not raised in the trial court cannot be raised on appeal. *Simpson v. Frontier Cmty. Credit* Union, 810 S.W.2d 147, 153 (Tenn. 1991); *see also Lovell v. Metropolitan Government*, 696 S.W.2d 2 (Tenn. 1985); *Lawrence v. Stanford*, 655 S.W.2d 927 (Tenn. 1983). Further, even if Wife was allowed to raise these arguments for the first time on appeal, the evidence supports the conclusion that Dr. Murray was well-qualified to conduct the evaluation and testify as an expert in this case. The trial court did not abuse its discretion in allowing the expert testimony.

### e. Evidence Standard

Wife claims that her due process rights have been violated because the trial court used the preponderance of the evidence standard instead of the clear and convincing standard with regard to its findings of fact in this custody determination. According to Wife, "[i]n cases involving a parent living with mental illness, using the clear and convincing standard reduces the risk of bias (perhaps unrealized even on the part of the fact finder) regarding mental illness and permits the stigma surrounding those suffering from it to filter the consideration of the best interests factors by the trial court." She asserts that the higher standard would have "better leveled the evidentiary playing field" for her.

The Tennessee Supreme Court has already opined that the clear and convincing evidentiary standard should be used with regard to the termination of parental rights. *Hawk v. Hawk*, 855 S.W.2d 573, 581 (Tenn. 1993). In this case, however, Wife's parental rights were not at issue. Rather, the trial court was deciding the residential parenting schedule for the Child. In decisions concerning comparative fitness, custody, visitation, and child support, the preponderance of the evidence standard is the correct standard to use. *See Hass v. Knighton*, 676 S.W.2d 554 (Tenn. 1984). The trial court used the proper evidentiary standard.

To the extent that Wife is advocating for the clear and convincing evidentiary standard to be used only for parents with mental illness, Husband avers that this would violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. As argued by Husband, a state "may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective." *Lehr v. Robertson*, 463 U.S. 248, 265 (1983) (quoting *Reed v. Reed*, 404 U.S. 71, 76 (1971)). Individuals may not be subjected to disparate treatment when there is no substantial relation between the disparity and an important state purpose. *Id.*

We do not find that Wife set forth a legitimate basis for parents with mental health diagnoses to be afforded a stricter evidentiary standard with regard to the care, custody, and control of their minor children. Her mental health diagnoses, while unfortunate, do not form a legitimate basis for her to demand a different evidentiary standard from that of parents without a mental health issue. Therefore, the preponderance of the evidence standard is the proper evidentiary standard. Further, as none of the constitutional issues asserted now by Wife were raised in the trial court, we find that they have been waived. *See also Civil Serv. Merit Bd. Of City of Knoxville v. Burson*, 816 S.W.2d 725, 735 (Tenn. 1991). The trial court did not use Wife's disability to create a presumption against her. The record reveals that the proceedings before that court were conducted properly and Wife is bound by the decisions of her experienced prior counsel.

### f. Dr. Robinson

Husband called Barbara Robinson ("Dr. Robinson"), his treating therapist, as an expert witness. Wife asserts that the probative value of Dr. Robinson's testimony in response to "thinly veiled hypotheticals" was substantially outweighed by prejudice to Wife. She claims that the trial court erred in disallowing her expert, Sydney Peltier, to testify while allowing Dr. Robinson.

To be admissible, expert testimony must be relevant and it must satisfy Tennessee Rules of Evidence 702 and 703. Rule 702 states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

- 14 -

Based on the foregoing, it is the responsibility of the trial court to determine that "(1) the witness qualifies as an expert, and (2) the expert's testimony is reliable in that the facts underlying the testimony are trustworthy and the testimony will substantially assist the trier of fact." *Freeman v. Blue Ridge Paper Products, Inc.*, 229 S.W.3d 694, 707-08 (Tenn. Ct. App. 2007) (citing *Brown*, 181 S.W.3d at 274). "The objective of the trial court's gatekeeping function is to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant fields.'" *Brown*, 181 S.W.3d at 275 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Dr. Robinson related at trial that she was not testifying specifically about Wife but instead was informing the court generally about the typical characteristics found in certain mental health disorders. Dr. Robinson observed that it would be unethical and biased for a treating mental health provider to testify on behalf of his or her patient. It appears the testimony was allowed by the trial court in order for the court to educate itself about the mental health diagnoses mentioned during trial. Such consideration of the relevancy of expert testimony is consistent with the trial court's role as a gatekeeper. *Scott*, 275 S.W.3d at 401. The court did not abuse its discretion in allowing Dr. Robinson's testimony.

### g. Motion in Limine

Wife asserts that the trial court violated her due process rights by granting Husband's motion in limine regarding Wife's failure to supplement her written discovery responses and lack of compliance with the court's scheduling order. At a hearing on July 28, 2016, Wife's counsel assured the court that Husband would be provided with a list of the expert witnesses Wife intended to call at trial by August 8, 2016; further, counsel stated that each witness would be produced for deposition no later than August 15, 2016. However, after she failed to produce them for depositions, Wife's expert witnesses were excluded from testifying at trial. We find no error on the part of the trial court. Wife's assertion that the court improperly granted Husband's motion lacks merit.

### h. Attorney's Fees

We heard oral argument in this case on August 9, 2017. On the same day, Wife filed a motion seeking an award of attorney's fees and costs associated with this appeal. The issue of appellate attorney's fees and costs was not raised by Wife in her brief as required by *Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 410-11 (Tenn. 2006). As noted in *Killingsworth*, "[o]ur rules of appellate procedure require an appellant to set forth in his or her brief '[a] statement of the issues presented for review.'" Tenn. R. App. P. 27(a)(4) (2006). A claim for appellate attorney's fees is an issue that should be

set before the appellate court because a remand to the trial court is not a foregone conclusion." *Id.* at 411. Further, pursuant to Rule 27(a)(8) of the Tennessee Rules of Appellate Procedure, an award of attorney's fees generated in pursuing the appeal is a form of relief that must be stated. *Id.* Because the request was raised by motion but not as an issue in briefing, we deny the motion.

## V. CONCLUSION

The decision of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are assessed to the appellant, Victoria Leanne Potts.

_____
JOHN W. MCCLARTY, JUDGE